JMP
8133
MAD

AO 106A (08/18) Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT
for the
Southern District of California

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br><br>Blue Apple iPhone<br>Seized as FP&F No. 2023565300048301 Line Item 0002<br>("Target Device") | ) ) ) ) ) ) ) Case No. **23mj1360** |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A, incorporated herein by reference.

located in the    Southern    District of    California   , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B, incorporated herein by reference.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:
   ☑ evidence of a crime;
   ☐ contraband, fruits of crime, or other items illegally possessed;
   ☐ property designed for use, intended for use, or used in committing a crime;
   ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| Title 8, U. S. C. § 1324 | Alien Smuggling |

The application is based on these facts:
See Attached Affidavit of Border Patrol Agent Shawna M. Wilson, incorporated herein by reference.

   ☑ Continued on the attached sheet.
   ☐ Delayed notice of _____ days *(give exact ending date if more than 30 days: _____)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

Shawna M. Wilson, Border Patrol Agent, U.S. Border Patrol
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by    telephone   
*(specify reliable electronic means)*.

Date:    04/18/2023   

*Judge's signature*

City and state:  San Diego, California     HON. Karen S. Crawford, U.S. Magistrate Judge
*Printed name and title*

# AFFIDAVIT

I, Shawna M. Wilson, being duly sworn, hereby state as follows:

## INTRODUCTION

1.  I submit this affidavit in support of an application for a warrant to search the following electronic devices:

> Blue Apple iPhone
> Seized as FP&F No. 2023565300048301 Line Item 0002
> ("Target Device")

the **Target Device**, as further described in Attachment A and to seize evidence of a crime, specifically, violations of Title 8, United States Code, Section 1324 (Alien Smuggling), as further described in Attachment B.

2.  The requested warrant related to the investigation and prosecution of Sadie Michelle MADRIGAL and Joe Lewis JEFFERSON, for attempting to transport and move illegal aliens within the United States. The **Target Device** is currently in the custody of Department of Homeland Security, Customs and Border Protection, United States Border Patrol, San Diego Sector.

3.  The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses, including my review of reports prepared by other law enforcement officers and agents. This affidavit is intended to show that there is sufficient probable cause for the requested warrant and does not purport to set forth all of my knowledge of the investigation into this matter. Dates and times are approximate.

//
//
//

1

## TRAINING AND EXPERIENCE

4. I have been employed by the USBP since 2019 and am currently assigned to the San Diego Sector Prosecutions Unit. I graduated from the Border Patrol Basic Academy at the Federal Law Enforcement Training Center in Artesia, New Mexico. I am a Federal Law Enforcement Officer within the meaning of Rule 41(a)(2)(C), Federal Rules of Criminal Procedure and have been a Federal Law Enforcement Officer for four years. I am authorized by Rule 41(a) Federal Rules of Criminal Procedure to make applications for search and seizure warrants and serve arrest warrants. I have experience and have received training with respect to conducting investigations of immigration and criminal violations of Titles 8, 18, 19, and 21 of the United States Code.

5. My current duties involve the preparation of criminal and administrative cases for prosecution, including the use of linking related subjects and information via electronic equipment and telephones. In the course of my duties, I investigate and prepare for prosecution cases against persons involved in the inducement, transportation, and harboring of illegal aliens into and within the United States; and, the utilization of illegally-obtained, counterfeit, altered or genuine immigration documents by illegal aliens to illegally gain entry or remain in the United States.

6. During my tenure as a Border Patrol Agent, I have participated in the investigation of a number of cases involving the smuggling of aliens from Mexico into the United States and transportation of illegal aliens within the United States, which have resulted in the issuance of arrest warrants, search warrants, seizure warrants, and the indictments of persons for alien smuggling, including drivers, passengers, and guides.

7. Through the course of my training, investigations, and conversations with other law enforcement personnel, I have gained a working knowledge of the operational habits of alien smugglers and alien transporters, in particular those who attempt to smuggle aliens into the United States from Mexico and transport them throughout the Southern District of California. I am aware that it is a common practice for alien smugglers to work

in concert with other individuals and to do so by utilizing cellular telephones to maintain communications with co-conspirators and/or illegal aliens in order to further their criminal activities. Because they are mobile, the use of cellular telephones permits alien smugglers and transporters to easily carry out various tasks related to their smuggling activities, including, *e.g.*, remotely monitoring the progress of the aliens while the aliens are in transit, providing instructions to transporters, guiding aliens to specific pick up locations, warning accomplices about law enforcement activity in the area and the status of check-point operations, and communicating with co-conspirators who guide aliens, coordinate drop off locations, and/or operate alien stash houses.

8. The smuggling of aliens generates many types of evidence, including, but not limited to, cellular phone-related evidence such as voicemail messages referring to the arrangements of travel, names, photographs, text messaging (via SMS or other applications), and phone numbers of co-conspirators and illegal aliens. For example, drivers and passengers responsible for transporting illegal aliens are typically in telephonic contact with co-conspirators immediately prior to and/or following the crossing of the illegal aliens at the border, at which time they receive instructions, including where to pick-up the illegal aliens for transportation into the United States and where to take the illegal aliens after crossing into the United States. These communications may also include locations for delivery to stash houses and/or sponsors. Illegal aliens also are typically in telephonic contact with co-conspirators prior to and following their crossing in order to make smuggling arrangements, receive instructions, and report their locations after crossing. It is common for alien smugglers to be in contact with co-conspirators weeks to months in advance of an event to recruit drivers and to coordinate the event. It is also common for co-conspirators to continue to contact each other by phone calls, social media, or messaging applications when contact is lost with the driver after an apprehension has occurred.

9.  Based upon my training, experience, and consultations with law enforcement officers experienced in narcotics trafficking investigations, and all the facts and opinions set forth in this affidavit, I know that cellular telephones (including their Subscriber Identity Module (SIM) card(s)) can and often do contain electronic evidence, including, for example, phone logs and contacts, voice and text communications, and data, such as emails, text messages, chats and chat logs from various third-party applications, photographs, audio files, videos, and location data. In particular, in my experience and consultation with law enforcement officers experienced in alien smuggling investigations, I am aware that individuals engaged in alien smuggling may store photos and videos on their cell phones that reflect or show co-conspirators and associates engaged in alien smuggling, as well as images and videos with geo-location data identifying alien smuggling transportation routes, and communications to and from recruiters and organizers.

10. This information can be stored within disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in the cellular telephone. Specifically, searches of cellular telephones may yield evidence:

   a. tending to indicate efforts to smuggle aliens from Mexico into the United States, and transport aliens inside the United States;

   b. tending to identify accounts, facilities, storage devices, and/or services–such as email addresses, IP addresses, and phone numbers–used to facilitate alien smuggling and transportation of smuggled aliens;

   c. tending to identify co-conspirators, criminal associates, or others involved in alien smuggling, or transportation of smuggled aliens;

   d. tending to identify travel to or presence at locations involved in the smuggling, transportation, or harboring of illegal aliens, such as stash houses, load houses, or delivery points;

   e. tending to identify the user of, or persons with control over or access to, the Target Device(s); and/or

4

  f. tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data involved in the activities described above.

## FACTS SUPPORTING PROBABLE CAUSE

11. On April 14, 2023, United States Border Patrol Agent C. Aguilar was performing his assigned duties in the Brown Field Border Patrol Station's area of responsibility. At approximately 7:45 AM, Agent Aguilar was driving along Otay Lakes Road near an area commonly known to Border Patrol Agents as "the Riding and Hiking gate". Approaching the area, Agent Aguilar observed an older model white van stopped at a dip in the road. Agent Aguilar then observed two individuals, dressed in black clothing, emerge from thick brush located on the side of Otay Lakes Road. The individuals ran across the road to quickly board the van. This location is approximately 5.6 miles north of the United States/Mexico International Boundary and 4.16 miles east of the Otay Mesa, California U.S. Port of Entry.

12. Agent Aguilar suspected there was an alien smuggling event occurring, therefore he activated his agency vehicle's emergency lights and sirens in order to stop the van, prevent it from traveling off and to then further investigate his observation. Agent Aguilar then contacted the San Diego Sector Border Patrol Dispatch and requested a license plate records check on the van. Record checks revealed that the vehicle was registered out of Downey, California with no travel history in the local area. Agent Aguilar approached the van on the driver's side and observed a female driver, later identified as defendant Sadie Michelle MADRIGAL. Agent Aguilar identified himself as a United States Border Patrol Agent and asked MADRIGAL if she knew the two individuals that had just boarded her vehicle. MADRIGAL shrugged her shoulders and said, "No". Agent Aguilar asked MADRIGAL if there were any drugs or weapons in the van. MADRIGAL placed both of her hands on the steering wheel and stated that she had her security service pistol in her backpack, which was located on the floorboard between the front seats. Agent Aguilar unholstered his service weapon and told MADRIGAL and the front seat passenger, later

identified as the defendant Joe Lewis JEFFERSON, to keep their hands on the steering wheel and dashboard. Agent Aguilar immediately called for other agents to assist. Upon the other agents' arrival, Agent Aguilar approached the two individuals whom he saw board the van, identified himself to them as a United States Border Patrol Agent and conducted an immigration inspection. Both passengers, later identified as material witnesses Jonathan HERNANDEZ-Arellanos and Hugo RANGEL Rangel, stated that they are citizens of Mexico without any immigration documents allowing them to enter or remain in the United States legally. At approximately 7:49 AM, Agent Aguilar placed MADRIGAL, JEFFERSON, HERNANDEZ and RANGEL under arrest.

13. A search subsequent to arrest revealed an unloaded pistol, a gun belt, three magazines loaded with live ammunition, a glass jar containing a green leafy substance that later tested positive for marijuana, three glass pipes with marijuana residue and a grinder.

14. At the time of arrest, a blue Apple iPhone (**Target Device**) was found in the center console of the van. The device was subsequently seized. MADRIGAL claimed that (**Target Device**) was her phone.

15. Defendant MADRIGAL was read her Miranda Rights and stated that she understood her rights and was willing to speak without an attorney present. MADRIGAL stated that she currently resides with her family in Downey, California. When asked about her involvement in today's smuggling event, MADRIGAL stated that she was simply out for a drive in her grandfather's minivan with her boyfriend and picked up some hitch hikers. MADRIGAL then stated they had driven down from Downey, California in the morning. MADRIGAL stated that during their drive, her boyfriend expressed to her that he wanted to visit his daughter that lives in San Diego. MADRIGAL encouraged the visit, decided to drive him to San Diego, but could not provide any further details about the address or destination they were to visit in San Diego. Once in San Diego, MADRIGAL stated that she drove out to a winding road and at some point decided to perform a U-turn. She stated to notice a couple of individuals standing on the side of the road and decided to give them

a ride. MADRIGAL stated she told them to get into her vehicle. MADRIGAL stated her boyfriend was okay with her picking up people on the side of the road. Once the two individuals got into her vehicle, MADRIGAL stated they didn't talk since they were immediately stopped by Border Patrol.

16. Defendant JEFFERSON was read his Miranda Rights and stated that he understood his rights and was willing to speak without an attorney present. Defendant JEFFERSON stated that he has a daughter living in San Diego, California. JEFFERSON stated he has been dating defendant MADRIGAL for approximately 8 or 9 months. JEFFERSON stated that he resides in Boston, Massachusetts. JEFFERSON stated he arrived in Los Angeles, California approximately two weeks ago. JEFFERSON stated he and MADRIGAL were out and about in the Los Angeles area last night and decided to drive to San Diego to pick up MADRIGAL's child in Tijuana, Mexico. JEFFERSON stated that he figured he could see his daughter as well. JEFFERSON stated they obtained the van from MADRIGAL's grandfather and drove to San Diego in the morning. JEFFERSON stated they were supposed to get a room in San Diego, but he fell asleep on the way down. JEFFERSON stated he was asleep when he woke to a commotion in the van. JEFFERSON stated he saw people behind him in the van and then a police officer ordering him to keep his hands on the dashboard. JEFFERSON stated he was completely surprised by what was happening around him. JEFFERSON stated he had no intention of being involved in anything illegal because he had lived that life and was recently released from parole and probation requirements. JEFFERSON stated he did not know the weapon was there, but did know MADRIGAL owned a weapon. JEFFERSON stated he wouldn't do this as he had a ticket for a flight back to Boston the next day, but could not produce a copy of his plane ticket.

17. Material witnesses HERNANDEZ and RANGEL stated that they are citizens of Mexico without any immigration documents allowing them to enter or remain in the United States legally. HERNANDEZ and RANGEL stated that they made smuggling

arrangements prior to illegally entering the United States and agreed to pay between $8,000-$8500 U.S. Dollars to be successfully smuggled into the United States. HERNANDEZ stated that his intended destination was somewhere in California. RANGEL stated that his intended destination was Los Angeles, California. HERNANDEZ and RANGEL stated that they walked from approximately one and a half days to two days, until reaching a paved road. RANGEL stated that upon arriving at the paved road, they waited for approximately 10 minutes when a white van arrived. HERNANDEZ and RANGEL stated that when they boarded the van, there was a light skinned heavy-set female as the driver and a dark-skinned male as the front seat passenger. HERNANDEZ and RANGEL stated that shortly after boarding the van, they were arrested by Border Patrol.

18. Based upon my experience and training, consultation with other law enforcement officers experienced in human trafficking investigations, and all the facts and opinions set forth in this affidavit, I believe that telephone numbers, contact names, electronic mail (email) addresses, appointment dates, messages, pictures, and other digital information are stored in the memory of the **Target Device**. In light of the above facts and my experience and training, there is probable cause to believe that the Defendant was using the **Target Device** to communicate with others to further illegal entry into the United States. Based on my training and experience, it is also not unusual for individuals, such as the Defendant, to attempt to minimize the amount of time they were involved in their smuggling activities, and for the individuals to be involved for weeks and months longer than they claim. Accordingly, I request permission to search the **Target Device** for data beginning on **March 14, 2023, through April 14, 2023**.

## METHODOLOGY

19. It is not possible to determine, merely by knowing the cellular telephone's make, model and serial number, the nature and types of services to which the device is subscribed, and the nature of the data stored on the device. Cellular devices today can be

8

simple cellular telephones and text message devices, can include cameras, can serve as personal digital assistants and have functions such as calendars and full address books and can be mini-computers allowing for electronic mail services, web services and rudimentary word processing. An increasing number of cellular service providers now allow for their subscribers to access their device over the internet and remotely destroy all of the data contained on the device. For that reason, the device may only be powered in a secure environment or, if possible, started in "flight mode" which disables access to the network. Unlike typical computers, many cellular telephones do not have hard drives or hard drive equivalents and store information in volatile memory within the device or in memory cards inserted into the device. Current technology provides some solutions for acquiring some of the data stored in some cellular telephone models using forensic hardware and software. Even if some of the stored information on the device may be acquired forensically, not all of the data subject to seizure may be so acquired. For devices that are not subject to forensic data acquisition or that have potentially relevant data stored that is not subject to such acquisition, the examiner must inspect the device manually and record the process and the results using digital photography. This process is time and labor intensive and may take weeks or longer.

20. Following the issuance of this warrant, a case agent familiar with the investigation will collect the subject cellular telephone and subject it to analysis. All forensic analysis of the data contained within the telephone and its memory cards will employ search protocols directed exclusively to the identification and extraction of data within the scope of these warrants.

21. Based on the foregoing, identifying, and extracting data subject to seizure pursuant to these warrants may require a range of data analysis techniques, including manual review, and, consequently, may take weeks or months. The personnel conducting the identification and extraction of data will complete the analysis within 90 days, absent further application to this court.

9

## CONCLUSION

22. Based on the facts and information set forth above, there is probable cause to believe that a search of the **Target Device** will yield evidence of an alien smuggling violation of Title 8, United States Code, Section 1324.

23. Because the **Target Device** was seized at the time of MADRIGAL's arrest and has been securely stored since that time, there is probable cause to believe that such evidence continues to exist on the **Target Device**. As stated above, I believe that the appropriate date range for this search is from **March 14, 2023, through April 14, 2023.**

24. Accordingly, I request that the Court issue a warrant authorizing law enforcement to search the item described in Attachment A seize the item listed in Attachment B using the above-described methodology.

I swear the foregoing is true and correct to the best of my knowledge and belief.

Shawna M. Wilson
Border Patrol Agent

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone on this 18th day of April 2023.

HON. KAREN S. CRAWFORD
United States Magistrate Judge

# **ATTACHMENT A**

## PROPERTY TO BE SEARCHED

The following property is to be searched:

Blue Apple iPhone
Seized as FP&F No. 2023565300048301 Line Item 0002
("Target Device")

Target Device is currently in the custody of the Department of Homeland Security, Customs and Border Protection, United States Border Patrol, San Diego Sector.

11

## ATTACHMENT B

ITEMS TO BE SEIZED

Authorization to search the cellular telephone described in Attachment A includes the search of disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in the cellular telephones for evidence described below. The seizure and search of the cellular telephone shall follow the search methodology described in the affidavit submitted in support of the warrants.

The evidence to be seized from the cellular telephones will be electronic records, communications, and data such as emails, text messages, chats and chat logs from various third-party applications, photographs, audio files, videos, and location data, for the period of **March 14, 2023, through April 14, 2023**:

a. tending to indicate efforts to smuggle aliens from Mexico into the United States, and transport aliens inside the United States;

b. tending to identify accounts, facilities, storage devices, and/or services– such as email addresses, IP addresses, and phone numbers–used to facilitate alien smuggling and transportation of smuggled aliens;

c. tending to identify co-conspirators, criminal associates, or others involved in alien smuggling, or transportation of smuggled aliens;

d. tending to identify travel to or presence at locations involved in the smuggling, transportation, or harboring of illegal aliens, such as stash houses, load houses, or delivery points;

e. tending to identify the user of, or persons with control over or access to, the Target Device; and/or

f. tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data involved in the activities described above,

which are evidence of violations of Title 8, United States Code, Section 1324.